1

2

3

4

5

6

7

8           IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CESARE REDMOND,

11           Petitioner,                   No. CIV S-12-0169 GEB DAD

12      vs.

13   G. SWARTHOUT, Warden,             FINDINGS AND RECOMMENDATIONS

14           Respondent.

15   _____/

16           Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas

17   corpus pursuant to 28 U.S.C. § 2254.  By this action, petitioner challenges a judgment of

18   conviction entered against him in the Sacramento County Superior Court in 2007.  This matter is

19   now before the court on respondent's motion to dismiss the action as barred by the applicable

20   statute of limitations.

21                          **BACKGROUND**

22           On September 29, 1997, petitioner was convicted in the Sacramento County

23   Superior Court on two counts of assault with an assault rifle, two counts of assault with a semi-

24   automatic firearm, unlawful possession of an assault rifle, two counts of being a felon in

25   possession of a firearm, and possession of marijuana for sale.  (Lodged Doc. No. 1.)  Thereafter,

26   /////

he was sentenced to a determinate state prison term of thirty-five years and four months.[1]  On

June 28, 2001, the California Court of Appeal for the Third Appellate District affirmed the

judgment of conviction.  (Lodged Doc. No. 2.)  On September 26, 2001, the California Supreme

Court denied a petition for review.  (Lodged Doc. No. 4.)

Petitioner subsequently filed three state habeas petitions collaterally attacking his

conviction.  On December 13, 2002, he filed a petition for writ of habeas corpus in the

Sacramento County Superior Court.  (Lodged Doc. No. 5.)  That petition was denied by order

dated January 16, 2003.  (Lodged. Doc. No. 6.)  On August 20, 2007, petitioner filed a petition

for writ of habeas corpus in the California Supreme Court.  (Lodged. Doc. No. 7.)   On February

13, 2008, that petition was denied as untimely.  (Lodged. Doc. No. 8.)  On June 24, 2011,

petitioner filed another petition for writ of habeas corpus in the California Supreme Court, for the

first time claiming that newly discovered evidence established his actual innocence of the crimes

for which he was convicted.  (Lodged. Doc. No. 9.)  On November 16, 2011, that petition was

also denied on untimeliness grounds, with the California Supreme Court citing the decisions in In

re Robbins, 18 Cal. 4th 770, 780 (1998) and In re Miller, 17 Cal. 2d 734, 735 (1941).  (Lodged.

Doc. No. 10.)

On January 23, 2012, the instant federal habeas petition was filed in this court.

(Docket No. 1.)  Therein, it appears that petitioner seeks federal habeas relief on the basis of all

claims he presented to the California Supreme Court in 2007 as well as on his actual innocence

claim presented to and rejected by the California Supreme Court in 2011.  (Id. at 4.)

## ARGUMENTS OF THE PARTIES

In moving to dismiss, respondent argues that the instant petition is time-barred.

Specifically, respondent argues that even taking into account tolling stemming from petitioner's

---

[1]  As noted by the California Court of Appeal, petitioner's abstract of judgement (Lodged Doc. No. 1) incorrectly reflected a state prison sentence of 35 years, 8 months imposed.  The state appellate court directed the trial court to correct the error.  (Lodged Doc. No. 2, n. 1.)

1   filing of his first state habeas petition, the statute of limitations for filing a federal petition

2   expired on January 29, 2003.  Respondent asserts that petitioner's filing of additional habeas

3   petitions in state court thereafter did not act to revive the already expired federal statute of

4   limitations.  (Resp't's Mot. to Dism. (Docket No. 15) at 2-5.)

5          Respondent also argues that petitioner is not entitled to equitable tolling under the

6   "fundamental miscarriage of justice" doctrine announced in Schlup v. Delo, 513 U.S. 298 (1995),

7   because petitioner has not presented a viable claim of actual innocence.  Specifically, respondent

8   asserts that the evidence petitioner "claims demonstrates his innocence is neither newly

9   discovered nor clearly exculpatory."  (Resp't's Mot. to Dism. (Docket No. 15) at 9.)  Respondent

10  also argues that petitioner's claim of entitlement to equitable tolling of the statute of limitations

11  "fails because his proffered evidence merely seeks to undercut incriminating evidence presented

12  at trial; it falls short of fundamentally calling into question the reliability of his conviction."  (Id.)

13         In opposition to the pending motion to dismiss, petitioner does not argue that his

14  petition was filed within the applicable statute of limitations.  Rather, petitioner contends that he

15  is entitled to equitable tolling of that limitations period.  He argues that the court should reach the

16  merits of his petition because the supporting declarations he has submitted from Anthony

17  Edwards, Angela Cofield, Kati M. Redmond, and himself establish his actual innocence, under

18  Schlup[2], with respect to the charges upon which he was convicted.  Petitioner also asserts that

19  the truth of those declarations must be presumed for purposes of determining whether his petition

20  is time-barred.  (Docket No. 18 at 8-9.)

21         In reply respondent reiterates his argument that petitioner has failed to offer newly

22  discovered evidence establishing his actual innocence.  Respondent asserts that the declarations

23  offered by petitioner do not refute the evidence introduced at his trial and do not establish that it

24  is more likely than not that no reasonable juror would have found petitioner guilty beyond a

25

26         [2]  Schlup v. Delo, 513 U.S. 298 (1995).

1   reasonable doubt had that new evidence been presented at his trial.  (Docket No. 19.)

2   **LEGAL STANDARDS**

3   **I.     AEDPA Statute of Limitations**

4   Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a

5   one-year period of limitation applies to a petition for writ of habeas corpus filed in federal court

6   by a person in custody pursuant to the judgment of a state court.  28 U.S.C. § 2244(d)(1).  The

7   statute of limitations applies to all federal habeas petitions filed after the statute was enacted on

8   April 24, 1996.  Lindh v. Murphy, 521 U.S. 320, 322-23 (1997).  Under § 2244(d)(1)(A), the

9   time for petitioner to file a federal habeas petition began running when his judgment of

10  conviction became final.  In this regard, on September 26, 2001, the California Supreme Court

11  denied review of petitioner's case.  (Lodged Doc. No. 4.)  His conviction became final ninety

12  days thereafter, on December 25, 2001, when the time for him to file a petition for certiorari with

13  the United States Supreme Court expired.  See Bowen v. Roe, 1888 F3d 1157, 1158-59 (9th Cir.

14  2001).  The one-year limitations period for his seeking of federal habeas relief started the next

15  day, December 26, 2001, and, absent any tolling, expired on December 26, 2002.  See Patterson

16  v. Stewart, 251 F.3d 1243, 1246 (9th Cir. 2001).

17  The AEDPA statute of limitations is tolled during the pendency of any "properly

18  filed" state collateral attack on the judgment.  Nino v. Galaza, 183 F.3d 1003, 1006-07 (9th Cir.

19  1999).  Furthermore, the intervals between stages of California's "unusual system of collateral

20  review" will toll the federal limitations period as long as the intervals are each of reasonable

21  duration.  Banjo v. Ayers, 614 F.3d 964, 968 (9th Cir. 2010).  Petitioner did not file his first state

22  habeas petition in the Sacramento County Superior Court until December 13, 2002.  Therefore,

23  352 days of the one-year limitations period for petitioner's seeking of federal habeas relief had

24  expired before being tolled upon the filing of that petition.  The Sacramento County Superior

25  Court denied that first state petition on January 16, 2003, causing the limitations period for the

26  filing of a federal petition to begin running again the next day.  Given this thirty-five day period

1   of statutory tolling, petitioner then had until January 29, 2003 to seek federal habeas relief.

2         Over four and half years later, on August 20, 2007, petitioner filed a petition for

3   writ of habeas corpus in the California Supreme Court.  (Lodged. Doc. No. 7.)[3]  By then the

4   statute of limitations for the seeking of federal habeas relief had long-since expired.  The same is

5   true with respect to the third state habeas corpus petition filed by petitioner in the California

6   Supreme Court on June 24, 2011.  (Lodged. Doc. No. 9.)  This is so because the filing of a new

7   state habeas petition cannot reinitiate or revive the limitations period once it has expired.  See

8   Ferguson v. Palmateer, 321 F.3d 820, 823 (9th Cir. 2003); see also Jiminez v. Rice, 276 F.3d

9   478, 481 (9th Cir. 2001).  Thus, petitioner's federal habeas corpus petition filed in this court on

10  January 19, 2012, was submitted almost nine years after the one-year statute of limitations for

11  doing so had expired.  Petitioner must show that he is entitled to statutory or equitable tolling of

12  the  statute of limitations set forth by AEDPA, otherwise his claims are time barred.

13        As noted above, petitioner does not dispute that his pending federal habeas corpus

14  petition was filed outside the statutory period.  Nor does he argue that he is entitled to statutory

15  tolling.  Rather, he asserts only that he has made a sufficient showing of his actual innocence so

16  as to entitle him to equitable tolling of the AEDPA's statute of limitations.

17  **II.    Equitable Tolling on the Grounds of Actual Innocence**

18        The United States Supreme Court has confirmed that the AEDPA statute of

19  limitations "is subject to equitable tolling in appropriate cases."  Holland v. Florida, ___U.S.___,

20  ___,130 S. Ct. 2549, 2560 (2010).  See also Doe v. Busby, 661 F.3d 1001, 1011 (9th Cir. 2011);

21  Lakey v. Hickman, 633 F.3d 782, 784 (9th Cir. 2011); Porter v. Ollison, 620 F.3d 952, 959 (9th

22  /////

23       [3]  The four-and-a-half year delay in the filing of state habeas petitions was obviously far too

24  lengthy to allow statutory tolling for that period of time.  See Stancle v. Clay, 692 F.3d 948, 956 (9th
    Cir. 2012) (unexplained gap of eighty-two days between denial of first state habeas petition and

25  filing of second state petition was unreasonable and foreclosed statutory tolling); Banjo v. Ayers, 614
    F.3d 964, 970 (9th Cir. 2010) (one hundred forty-eight day unexplained delay between denial and

26  new filing found to unreasonable).

Cir. 2010).[4]  Indeed, because § 2244(d) is not jurisdictional, it is "subject to a 'rebuttable

presumption' in favor of 'equitable tolling'"  Holland, 130 S. Ct. at 2560 (quoting Irwin v. Dep't

of Veterans Affairs, 498 U.S. 89, 95-96 (1990)).  See also Lee v. Lampert, 653 F.3d 929, 933

(9th Cir. 2011) (en banc).  "[A] credible claim of actual innocence constitutes an equitable

exception to AEDPA's limitations period, and a petitioner who makes such a showing may pass

through the Schlup gateway and have his otherwise time-barred claims heard on the merits."

Lee, 653 F.3d at 932.

Generally a federal habeas petitioner "is 'entitled to equitable tolling' only where

he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary

circumstance stood in his way' and prevented timely filing."[5]  Holland 130 S. Ct. at 2562

(quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)).  See also Doe, 661 F.3d at 1011;

Lakey, 633 F.3d at 784; Porter, 620 F.3d at 959; Harris v. Carter, 515 F.3d 1051, 1054 (9th Cir.

2008); Stillman v. LaMarque, 319 F.3d 1199, 1202 (9th Cir. 2003).  However, neither the

Supreme Court nor the Ninth Circuit have held that a showing of diligence is needed to pass

through the actual innocence gateway and other courts to address the subject have specifically

held that diligence need not be shown in such circumstances.  See Lampert, 653 F.3d at 935 n. 9

("Because this case does not present the question, we need not-and do not-decide what diligence,

if any, a petitioner must demonstrate in order to qualify for the actual innocence exception

recognized in this opinion."); see also Perkins v. McQuiggin, 670 F.3d 665 (6th Cir. 2012)

(holding that reasonable diligence need not be shown when seeking equitable tolling of the

statute of limitations due to actual innocence); Lopez v. Trani, 628 F.3d 1228, 1230-31 (10th Cir.

---

[4]  The Ninth Circuit had previously so held.  See Ramirez v. Yates, 571 F.3d 993, 997 (9th Cir. 2009); Waldron-Ramsey v. Pacholke, 556 F.3d 1008, 1011 n.2 (9th Cir. 2009); Calderon v. U.S. District Court for the Central District of California (Kelly), 163 F.3d 530, 541 (9th Cir. 1998) (en banc).

[5]  "The diligence required for equitable tolling purposes is 'reasonable diligence' . . . not 'maximum feasible diligence.'"  Holland, 130 S. Ct. at 2565.

2010) ("We thus reject the reading of our precedent that would require a habeas petitioner seeking equitable tolling on actual innocence grounds to demonstrate that he diligently pursued his actual innocence claim."); Souliotes v. Hedgpeth, No. 1:06-cv-0667 AWI MJS HC, 2012 WL 2684972, at *4 (E.D. Cal. July 6, 2012) ("The court agrees . . . that there is no diligence requirement to present an actual innocence claim as to overcome the AEDPA's statute of limitations.)  Accordingly, the court will not consider whether petitioner has been diligent in presenting his actual innocence claim.

To obtain equitable tolling of the AEDPA statute of limitations in order to present an actual innocence claim based on newly discovered evidence, a petitioner must demonstrate "that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt." Lampert, 653 F.3d at 938.[6]  Moreover, "[a]ctual innocence means factual innocence, not mere legal insufficiency." Bousley v. United States, 532 U.S. 614, 623 (1998).  In this regard, the Ninth Circuit has observed:

---

[6] Indeed, it remains an open question whether a freestanding actual innocence claim is even cognizable in a federal habeas proceeding.  See District Attorney's Office for Third Judicial Dist. v. Osborne, 557 U.S. 52, 71 (2009) ("Whether such a federal right [to be released upon proof of actual innocence] exists is an open question.  We have struggled with it over the years, in some cases assuming, arguendo, that it exists while also noting the difficult questions such a right would pose and the high standard any claimant would have to meet."); House v. Bell, 547 U.S. 518, 554-55 (2006).  Even assuming, that a freestanding actual innocence claim provides a basis for federal habeas relief and would constitute constitutional error within the meaning of 28 U.S.C. § 2244(b)(2)(B), relief on such a claim could be granted only based upon convincing new evidence which left the federal habeas court persuaded that the petitioner's actual innocence was unquestionably established. Morales v. Ornoski, 439 F.3d 529, 533 (9th Cir. 2006) ("As explained in Schlup v. Delo, 513 U.S. 298, 327 (1995), a substantive "Herrera-type claim" - i.e., a claim based on factual innocence - "would have to fail unless the federal habeas court is itself convinced that th[e] new facts unquestionably establish [Morales's] innocence."); see also House, 547 U.S. at 555 ("Herrera requires more convincing proof of innocence than Schlup.")  Finally, and as noted above, to the extent that such a claim were instead characterized as a procedural "gateway" claim under the "miscarriage of justice" exception addressed in Schlup, petitioner would have to show by clear and convincing evidence that no reasonable jury would have convicted him. Calderon v. Thompson, 523 U.S. 538, 559-60 (1998); Sawyer v. Whitley, 505 U.S. 333, 348 (1992); Morales, 439 F.3d at 533, n. 4; Paradis v. Arave, 130 F.3d 385, 396 (9th Cir. 1997).  The exception therefore provides a "very narrow" window.  Sawyer, 505 U.S. at 341.  Obviously, "[t]his standard is not easy to meet." Gandarela v. Johnson, 286 F.3d 1080, 1086 (9th Cir. 2002).  See also King v. Trujillo, 638 F.3d 726, 730 (9th Cir. 2011).

1
2
3
4
5
6
7

> Schlup requires a petitioner "to support his allegations of
> constitutional error with new reliable evidence — whether it be
> exculpatory scientific evidence, trustworthy eyewitness accounts,
> or critical physical evidence — that was not presented at trial."
> Schlup, 513 U.S. at 324, 115 S. Ct. 851. The habeas court then
> "consider[s] all the evidence, old and new, incriminating and
> exculpatory," admissible at trial or not.  House, 547 U.S. at 538,
> 126 S. Ct. 2064 (internal quotation marks omitted); Carriger [v.
> Stewart], 132 F.3d [463,] 477–78 [(9th Cir. 1997)].  On this
> complete record, the court makes a " 'probabilistic determination
> about what reasonable, properly instructed jurors would do.' "
> House, 547 U.S. at 538, 126 S. Ct. 2064 (quoting Schlup, 513 U.S.
> at 329, 115 S. Ct. 851).

8   Lampert, 653 F.3d at 938.  The court "must assess the probative force of the newly presented

9   evidence in connection with the evidence of guilt adduced at trial," and "may consider how the

10   timing of the submission and the likely credibility of the affiants bears on the probable reliability

11   of that evidence." Schlup, 513 U.S. at 332.

12          Below, after providing a summary of the evidence introduced at petitioner's trial

13   which resulted in his conviction, the court will apply these legal standards to the arguments of the

14   parties in determining whether petitioner's actual innocence claim is credible enough to entitle

15   him to equitable tolling of the AEDPA statute of limitations.

16                                              **ANALYSIS**

17   **I.      Summary of Evidence Introduced at Petitioner's Trial**

18          Neither petitioner nor respondent dispute the statement of facts as set forth by the

19   California Court of Appeal in its opinion affirming petitioner's judgment of conviction.  That

20   court recounted the evidence as follows:

21
22
23

> This case involves a series of shooting incidents between
> members of two rival gangs in the Valley Hi area of Sacramento:
> the Valley Hi Crips and the Valley Hi Pirus.  (The Pirus are
> affiliated with a gang known as the Bloods, the traditional rivals of
> the Crips.)  Defendant was a member of the Crips.

24
25
26

> At about 4:30 p.m., February 19, 1997, Priscilla Lopez was
> at the front door of her apartment in the Country Wood Village
> Apartments.  She noticed a man and woman outside arguing.
> Lopez recognized the woman as a resident of the complex.  The
> man and woman were later identified as defendant and his wife,

Kati Redmond. Lopez then heard four shots fired, and saw
defendant run past her apartment. He was holding a pistol. Lopez
saw defendant turn and fire one shot as he ran through the
complex's parking stalls. She saw Kati Redmond return to her
building. Lopez returned to her apartment and called the police.

In the late night and early morning hours of February 20
and 21, respectively, four members of the Valley Hi Pirus were
sitting in a car parked at the Country Wood Village Apartments
drinking beer and smoking marijuana. Two men walked by the
car, both wearing hoods over their heads. The men stopped; then
began firing shots into the car. One of the victims estimated 15
shots were fired. Two of the passengers, Ray Jedkins and Jessie
Wright, were wounded in the attack. Police later collected 15 .45
caliber shell casings from the area.

Late on February 24, 1997, Leonard Feltus; his wife; two
stepsons, Andre and Laun; and a foster child were in their home at
4093 Sea Meadow Way, near the intersection of Franklin and
Valley Hi Roads. A friend of Andre's, Lynne Jones, a member of
the Valley Hi Pirus, also lived with Feltus's family. Near
midnight, the doorbell rang. Feltus went to the door and, without
opening it, asked who was there. Someone on the other side of the
door said they wanted to see Andre. The voice sounded like an
adult male. Feltus said no one comes in or leaves his house at that
hour of the night. He told the person to come back the next day.

Approximately 15 minutes later, shots were fired into
Feltus's home and garage, injuring Feltus. The bullets also ruined
Feltus's car, and left about 20 holes in various parts of the house.
Police later found eight 9 millimeter shell casings on the front
porch, and eight 7.62 x 39 millimeter shell casings on the
driveway.

On the evening of February 25, 1997, the police arrested
Nakeyo Butler, Andre Cunningham and Anthony Edwards for an
unrelated robbery. At that time, Butler was found to be carrying a
Glock 9 millimeter handgun. At defendant's trial, a criminalist
testified the Glock handgun had fired the eight 9 millimeter shell
casings found on Feltus's front porch at 4093 Sea Meadow Way.

Police took Edwards into custody and interviewed him.
Edwards admitted he was a Crip and identified the defendant as a
Crip. He told the police the defendant had spoken with him about
a shooting in which the defendant had participated. The defendant
told Edwards he (the defendant) had fired an assault weapon into
the garage door of a house in the Valley Hi area while Butler fired
a 9 millimeter gun into the home's front door.

Defendant told Edwards the attack was in retaliation for a
shooting incident which occurred earlier that evening of February

24.  At that earlier incident, defendant, Edwards, and one Robert Rhinehart were in defendant's car at the intersection of Valley Hi and Valley Green when people in a passing brown car fired shots, hitting defendant's car in the front quarter panel.  Defendant returned fire with a .45 caliber semiautomatic pistol, and Rhinehart fired a 9 millimeter pistol.  At defendant's trial, a resident of the neighborhood testified he heard shots at about 8:00 p.m., February 24.  The next morning, the resident collected eleven 9 millimeter shell casings from the area of the intersection.

Edwards also told the police he had, within a week of the interview, seen assault weapons at the home of defendant's mother. He also told police he had seen defendant in possession of a .45 caliber pistol while at the defendant's girlfriend's house.

In the early morning hours of February 28, 1997, police officers executed a search warrant at the home of defendant's girlfriend, Richelle Lugo.  Defendant was present at the time and was taken into custody.  The police found two pages of a diary or planner on the floor near where officers had seated the defendant. The pages were apparently torn out of its book, and were for the dates of February 13 through February 26, 1997.  Entries on those pages were written by defendant's wife.  Her entries indicated defendant had been a victim of a gang attack on February 19, and he had retaliated on February 20.

Officers located defendant's vehicle parked in the garage at his girlfriend's residence.  A bullet had damaged the car's right front quarter panel.  Inside the car, officers found a spent .45 caliber casing.  Inside the car's trunk, officers found a SKS assault rifle and magazine loaded with 7.62 x 39 millimeter ammunition. This particular magazine held 30 rounds of ammunition.  At the time of its discovery, the assault rifle had one round in its chamber and 22 rounds in the magazine, eight rounds short of a fully loaded magazine.

Officers also found in the car's trunk two partially full boxes of 7.62 x 39 millimeter ammunition and a store receipt from Big 5 Sporting Goods dated February 19 for the purchase of two boxes of 7.62 x 39 millimeter ammunition.  In addition, two boxes of .38 caliber ammunition and four boxes of .45 caliber ammunition were found in the trunk.  Officer also found a .45 caliber automatic pistol with one live round and .45 caliber magazines and ammunition inside the garage.

At defendant's trial, a criminalist testified he determined the fifteen .45 caliber shell casings found in the parking lot of the Country Wood Village Apartments on the morning of February 21 had been fired from the .45 caliber pistol found in the garage at defendant's girlfriend's home.  The criminalist also testified he determined the eight spent 7.62 x 39 shell casings found in Feltus's

10

driveway on February 25 had been fired from the assault rifle found in the trunk of defendant's car.

Also at defendant's trial, Leah Zamora, an employee of Big 5 Sporting Goods, identified defendant as the person who purchased two boxes of 7.62 x 39 millimeter bullets from her store on February 19, 1997.

* * *

Edwards testified at defendant's preliminary hearing. Edwards's testimony, however, was evasive and inconsistent with the statements he had made to Robinson and Lopez following his arrest.  Specifically, Edwards testified he did not recall telling Robinson that defendant had informed Edwards of his role in the Feltus shooting or that he had seen weapons at defendant's mother's house or on defendant's possession.

Defendant's preliminary hearing counsel, an attorney different than defendant's trial attorney, was provided an opportunity to cross-examine Edwards at the preliminary hearing. However, counsel asked no questions of Edwards.

The prosecution subsequently called Robinson to the stand. Robinson testified of the statements made by Edwards during their unrecorded interview at the sheriff's department.

At trial, the prosecution called Edwards as a witness, but Edwards asserted his Fifth Amendment rights and refused to testify.  The trial court allowed the prosecution to read Edwards preliminary hearing testimony into the record.

Over defendant's continuing hearsay objection, the trial court thereafter allowed Robinson to testify as to the statements Edwards made during the unrecorded interview.  Superior Court Judge Peter Mering admitted the testimony. . . .

(Lodged Doc. No. 2 (Opinion) at 4-8, 20-22.)

## II.    Newly Presented Evidence

As noted above, in the petition pending before this court petitioner claims that newly discovered evidence establishes his actual innocence on the charges upon which he was convicted.  In support of that claim, and in turn in support of his argument for equitable tolling of the applicable one-year statute of limitations, he offers the sworn declarations of himself,

/////

1   Anthony Edwards[7], Robert Rhinehart, Angela Cofield, and Kati M. Redmond.[8]  All of the

2   declarations were signed by the declarants at least ten years after the commission of crimes for

3   which petitioner was convicted.  Petitioner argues that these declarations establish that he was

4   not involved in the two separate shooting incidents that partially resulted in his convictions.  The

5   first such shooting occurred in the late night and early morning hours of February 20 and 21,

6   1997, at the Country Wood Village Apartments.  The second such shooting occurred late on

7   February 24, 1997, at the residence of Leonard Feltus.

8         A.      Petitioner's Declaration[9]

9              In his own declaration, petitioner declares as follows.  He was not present at either

10  the Country Wood Village Apartments shooting or the Feltus residence shooting.  (Docket No. 1,

11  Ex. A, 95.)  He was friends with the Country Wood Village Apartments shooting victims, Wright

12  and Jedkins, implying that he would not have harmed them.  (Id. at 96.)  He attended school with

13  Jedkins and knew him since the mid-1980's and knew Wright from the Country Wood Village

14  Apartments since 1996, when petitioner moved there with his wife and children.  (Id.)  On

15  February 24, 1997, from 10:00 to 11:00 p.m he was "in his car after picking up his cousin Robert

16  Rhinehart . . . and his cousin's friend Anthony Edwards . . ., and Andre Cunningham . . . ."  (Id.)

17  Petitioner received a page from his wife at about 11:00 p.m. indicating it was an emergency and

18

19  _____

    [7]  In fact, Anthony Edwards has executed three such declarations, each bearing a different
    date.

20  [8]  The various declarations submitted by petitioner in support of his actual innocence claim
    appear in multiple documents submitted in this habeas action.  The Petition (Docket No. 1) is the

21  only document to include all pertinent declarations, with one exception.  See footnote 9, below.
    Attached to the petition are 183-pages of Exhibits and Declarations.  As it appears on the court's

22  electronic docket "Document #1" of the petition contains the 10-page petition itself as well as the
    111-page Exhibit A to the petition.  "Attachment #1" or "part 2" of the petition contains Exhibits

23  B-F, totaling 72 pages.  In the interest of clarity, and due to the fact that "Attachment #1" is a
    continuation ("part 2") of "Document #1," the declarations will be cited according to their

24  corresponding Exhibit with the page numbers citations to the page number reflected on the court's
    CM/ECF system and not to page numbers assigned by the parties.

25
    [9]  Petitioner's declaration is not dated, but was presumably drafted in 2007.  (Docket No. 1,

26  Ex. A at 95.)

1  prompting him to go to James Hampton's house to contact her.  (Id. at 96-97.)  Rhinehart,

2  Edwards, and Cunningham  waited in petitioner's car outside the Hampton residence.  (Id. at 97.)

3  Fifteen minutes later, after speaking with his wife, petitioner told those waiting in his car that his

4  apartment had been burglarized and that he had to go meet his wife, causing Rhinehart, Edwards,

5  and Cunningham to go "their separate ways from Petitioner."  (Id.)  Petitioner remained at the

6  Hampton residence until 12:00 a.m., talking on the phone with his wife and their neighbor,

7  Tammy Jones.  (Id.)  At 12:00 a.m petitioner met has wife at his mother's house where they

8  stayed for about an hour.  (Id. at 98.)  Petitioner, along with his wife and children, stayed in a

9  motel that evening due to the break-in at their apartment.  (Id.)

10      B.      Anthony Edwards' Declarations

11          Petitioner offers three declarations from Anthony Edwards, dated June 7, 2007,

12  March 7, 2011[10], and November 4, 2011.  (Docket No. 1, Ex. A at 105; (part 2) Ex. B at 30; (part

13  2) Ex. E at 60.)[11]  Each of the declarations from Edwards are somewhat different.  However, in

14  each Edwards states that petitioner was not involved in either the Country Wood Village

15  Apartments shooting or the Feltus residence shooting and that he, Edwards, misled or lied to the

16  police regarding petitioner's involvement in these crimes when he was initially questioned.

17          Specifically, in his declaration dated June 7, 2007, Edwards states as follows.  He

18  lied to the police in telling them that "Rhinehart informed [him] that he[, Rhinehart,] and

19  Redmond[, the petitioner,] were responsible for the shooting at the Country Wood Village

20  Apartments."  (Docket No. 1, Ex. A at 107.)  Edwards knew "Redmond was in possession of a

21  .45 caliber semi-automatic and an assault rifle (S.K.), after the shooting, and that it would appear

22

23          [10]  The Edward's declaration dated  March 7, 2011, attached to the petition before this court
24  (Docket No. 1 (part 2), Ex. B at 30) is missing page two.  This declaration can be found in its entirety
    at  Lodged Doc. No. 9, Ex. A.

25          [11]  In his latter two declarations, Edwards also refers to a declaration sent to him by petitioner
26  in 2002 that he purportedly also signed.  However, this 2002 declaration is not a part of the record
    before this court and is not referred to by petitioner.

1   as if Redmond had been the shooter . . . because I swap (sic) weapons to thwart the police from

2   locating same." (Id.)[12]   Edwards was with petitioner on the night of February 24, 1997, and they

3   did stop at the Hampton residence so petitioner could call his wife and shortly thereafter parted

4   ways, with petitioner going "to his wife's house and [he] left for [his] house which was right

5   around the corner." (Id. at 108.)

6          In his next declaration, dated March 7, 2011, Edwards declared as follows.

7   Edwards asked petitioner to "pick up guns that [he and some friends] had used in two recent

8   shootings." (Lodged Doc. No. 9, Ex. A at 2.)  Edwards "heard that Petitioner had been shot at"

9   so he and  Rhinehart "shot at the guys in the car" because he "did not want the Pirus to think they

10  could go around shooting at people without repercussions." (Id.)  Edwards concedes that at

11  petitioner's preliminary hearing he (Edwards) "testified that [he] . . . only told them that they

12  could find the guns at" petitioner's house or residence.  (Id.)

13         The later November 4, 2011 declaration from Edwards is substantially similar to

14  his March 7, 2011 declaration.  However, in the November 4, 2011 declaration Edwards does

15  specifically state that he asked petitioner "to pick up the assault rifle that [he and some friends]

16  had used  in two recent house shootings." (Docket No. 1 (part 2), Ex. E at 60) (emphasis added).

17  Edwards also again states that he and Rhinehart were responsible for the Country Wood Village

18  Apartments shooting and adds that he "previously had an altercation with" the "guys in the car."

19  (Id. at 61.)

20         In each of his declarations Edwards contends that he was responsible for the

21  shooting at the Feltus residence late on February 24, 1997.  In his two most recent declarations

22  Edwards states that he was shot at by Lyn Jones within two days of the Country Wood Village

23  Apartments shooting.  In his November 4, 2011 declaration, Edwards states that during this

24  incident he returned fire with an assault rifle but does not indicate whether it was the same

25

26         [12]   Edwards, however,  took no responsibility for the Country Wood Village Apartments
    shooting himself in this declaration.

1    assault rifle used in the shooting at the Feltus residence.  (Id. at 61.)  In his two most recent

2    declarations Edwards also states that he later retaliated by shooting at the Feltus residence, where

3    he knew Jones lived.  (Docket No. 1 (part 2), Ex. B at 30; Ex. E at 61.)  Edwards asserts that he

4    and an unnamed "friend" went to the Feltus residence, retrieved weapons from "the car," and

5    fired at the house.  (Id.)  Edwards declares that it was his unnamed "friend" who was firing the

6    assault weapon at the residence.  (Id.)  In his November 4, 2011 declaration, Edwards at least

7    suggests that he gave petitioner the assault rifle which Edwards' friend used to fire at the Feltus

8    residence after that shooting occurred.  (Docket No. 1 (part 2), Ex. E at 60.)

9         C.    Robert Rhinehart's Declaration

10        Rhinehart's declaration was signed on November 17, 2006.  (Docket No. 1, Ex. A

11   at 111.)  Therein, Rhinehart for the most part relates only what his cousin, Nakeyo Butler,

12   allegedly told him.  (Id. at 112-14.)  However, Rhinehart also states that he "was not with

13   Petitioner on February 20/21, 1997."  (Id. at 113.)  On the morning of February 25, 1997,

14   Rhinehart witnessed Butler obtaining a "nine millimeter glock" from Edwards.  (Id.)  Butler was

15   arrested for possession of the same weapon later the same day.  (Id.)  Rhinehart was arrested "for

16   suspicion of being involved in" the Country Wood Village Apartments shooting but was later

17   released.  (Id.)  Nowhere in his declaration does Rhinehart admit having any role in that shooting.

18        D.    Angela Cofield's Declaration

19        Angela Cofield is petitioner's mother and her declaration on petitioner's behalf

20   was signed on November 20, 2006.  (Docket No. 1, Ex. A at 117.)  Therein she declares only that

21   on February 24, 1997, at approximately 11:50 p.m., her son arrived at her home to meet his wife

22   and children because their home had been robbed earlier that evening and that her son left at

23   approximately 12:40 to 12:50 a.m. to go to a hotel with his wife and children.  (Id. at 118.)

24        E.    Kati M. Redmond's Declaration

25        Kati M. Redmond is petitioner's wife.  Her declaration submitted in support of

26   petitioner's actual innocence claim was executed on June 28, 2011.  (Docket No. 1 (part 2), Ex. F

at 65.)  Therein, petitioner's wife declares as follows.  The information noted in her diary or day planner that was seized by police was received by her "from a young lady of African American descent (sixteen or seventeen years of age) who was a neighbor in the apartment complex at the time."  (Id. at 66.)  Redmond paged petitioner at or around 11:00 p.m. on the night in question to inform him of the robbery at their home, that he immediately answered the "page and called back," and that he explained to her that she needed to call the police, who arrived "shortly after 11:00 p.m."  (Id. at 67-68.)  Petitioner was on the phone with Redmond or her neighbor until the police left, at which time she left to meet petitioner at his mothers house.  (Id. at 68.)  Redmond arrived at her petitioner's mother's house "at or around 12 midnight," and she and petitioner stayed the night together, with their children, in a motel.  (Id. at 69.)

## III.   The Probative Force of Petitioner's New Evidence Relative to the Evidence Introduced at His Trial

Petitioner's contention is, in essence, that the declarations he now offers constitute reliable and trustworthy eyewitness accounts that were not presented at his trial which, had they been presented, make it more likely than not that no reasonable jury would have found him guilty of the offenses for which he was convicted beyond a reasonable doubt.  This is because, according to petitioner, the new evidence he has now come forward with over a decade after his trial establishes that he was not present at either the Country Wood Village Apartments or the Feltus residence shootings.

Of course, one's actual innocence is not established merely by coming forward with relevant new evidence.  Rather, as discussed above a petitioner must support his claim with reliable new evidence "— whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial."  Lampert, 653 F.3d at 938 (quoting Schlup, 513 U.S. at 324).   Even when a petitioner does so, the habeas court must then "consider all the evidence, old and new, incriminating and exculpatory," admissible at trial or not.  Lampert, 653 F.3d at 938 (quoting House, 547 U.S. at 538 and Carriger, 132 F.3d at

477–78.)  After considering all of this evidence and on a complete record, the court makes a

" 'probabilistic determination about what reasonable, properly instructed jurors would do.' "

Lampert, 653 F.3d at 938 (quoting House, 547 U.S. at 538) (in turn quoting Schlup, 513 U.S. at

329).  Thus, the habeas court "must assess the probative force of the newly presented evidence in

connection with the evidence of guilt adduced at trial," and "may consider how the timing of the

submission and the likely credibility of the affiants bears on the probable reliability of that

evidence."  Schlup, 513 U.S. at 332.[13]  Below, the court will conduct the required inquiry with

respect to both of the shootings that petitioner was convicted in connection with.

     A.   Evidence Concerning the Country Wood Village Apartments Shooting

       The only new eyewitness evidence that petitioner offers in support of his actual

innocence claim in connection with the Country Wood Village Apartments shooting comes in the

form of declarations by Anthony Edwards.  Based upon the record before this court, however,

Edwards' reliability and trustworthiness are highly suspect.  Based upon the evidence introduced

at petitioner's trial and the various inconsistencies in Edwards' previous testimony and his

multiple declarations, the court concludes that his most recent declarations do not constitute

reliable new evidence.

       Although Edwards consistently asserts in his most recent declarations that he

misled or lied to the police during his initial interrogation in which he implicated petitioner, this

court must consider all the evidence, old and new, admissible at trial or not.  Lampert, 653 F.3d

at 938.  Police officers testified at petitioner's trial that Edwards informed them that petitioner

was involved in the shootings.  Moreover, in his June 7, 2007 declaration submitted by petitioner

here, Edwards admits telling the police that petitioner was involved in the Country Wood Village

Apartments shooting.  At petitioner's preliminary hearing in state court Edwards testified that he

---

[13]  Petitioner argues that "it must be presumed the affidavits to be true for purposes of determining whether Petitioner is procedurally barred."  (Docket. No. 18 at 8.)  Petitioner cites no authority in support of this argument and the court finds it unpersuasive as inconsistent with the authorities discussed in these findings and recommendations.

1  "only told [the police] that they could find the guns at Petitioner's" house or residence.  Thus,

2  Edwards' preliminary hearing testimony contradicted both the police officers' trial testimony as

3  well his own later admission that he informed the police that petitioner was involved in the

4  Country Wood Village Apartments shooting.

5  In his second and third declarations, Edwards swore that it was he and Rhinehart,

6  not petitioner, who took part in the Country Wood Village Apartments shooting.  On the other

7  hand, Rhinehart in his declaration submitted by petitioner in these habeas proceedings makes no

8  admission that he participated in that shooting.  Rather, Rhinehart states only that he was not

9  with petitioner on either February 20 or 21 in 1997.  Although Edwards claimed that he swapped

10  guns with petitioner, there is no clear assertion by Edwards that he gave petitioner the .45 caliber

11  automatic pistol after it was used by him in this shooting.  Moreover, petitioner in his own

12  declaration has failed to address how and when he acquired the weapon which was found in his

13  possession by police.[14]

14  Moreover, there was ample evidence of petitioner's guilt in connection with the

15  Country Wood Village Apartments shooting introduced at his trial.  Priscilla Lopez, a woman

16  living in the same apartment complex as petitioner, testified at trial that on February 19, 1997,

17  she witnessed petitioner in an altercation at the complex in which he possessed and fired a

18  weapon.  Later, the police found a note written by petitioner's wife indicating that he had been a

19  victim of a gang attack on February 19, and that he had retaliated on February 20, the night of the

20  Country Wood Village Apartments shooting.  In addition, police officers testified that Edwards

21  had informed them of an altercation occurring on February 24, 1997, the night of the Feltus

22  residence shooting, in which petitioner, Rhinehart, and Edwards were in petitioner's car when

23  people in a passing car fired shots, hitting petitioner's car in the front quarter panel.  Edwards

24

25  [14]  The court also notes that petitioner has come forward with no alibi evidence relating to
the evening of the Country Wood Village Apartments shooting.  He merely states that he was a

26  friend of the victims of that shooting and did not take part in the event.

told police that petitioner returned fire with a .45 caliber semiautomatic pistol.  Officers testified that when they located petitioner's vehicle parked in the garage at his girlfriend's residence, the car's right front quarter panel had in fact been damaged by a bullet.  Inside the car, officers found a spent .45 caliber casing.  Inside the car's trunk, officers found four boxes of .45 caliber ammunition.  Elsewhere in the garage, officers found a .45 caliber automatic pistol with one live round, .45 caliber magazines, and more ammunition.  At petitioner's trial, a criminalist testified he determined the fifteen .45 caliber shell casings found in the parking lot of the Country Wood Village Apartments on the morning of February 21, 1997, had been fired from the .45 caliber pistol found in the garage.  Finally, at trial Edwards' preliminary hearing testimony, to the effect that he did not recall telling the police that petitioner had admitted his role in one of the assaults, was read into the record.  Thus, the jury was well aware that Edwards either disputed, or at least had waffled on, the police account that he had implicated petitioner in the shooting.  Nonetheless, having the opportunity to weigh all of the evidence the jury found petitioner guilty of the charged offenses beyond a reasonable doubt.

In light of Edwards' lack of credibility and reliability, the court finds that petitioner has failed to present any reliable new evidence concerning the Country Wood Village Apartments shooting.  Petitioner has not even approached making the showing that would be required to proceed through the Schlup gateway on an actual innocence claim with respect to this shooting.  See Lampert, 653 F.3d at 938.

B.   Evidence Concerning the Feltus Residence Shooting

In support of his actual innocence claim with respect to the Feltus residence shooting, petitioner again offers the declaration of Anthony Edwards and those of two witnesses (his mother and his wife) whom provide petitioner with an alibi at the time of this shooting.  For the reasons noted above, Edwards' reliability and trustworthiness are highly suspect.  Moreover, petitioner's remaining new evidence bears little probative value.

/////

1        In addressing the Feltus residence shooting in his declarations, Edwards

2   consistently asserts that he participated in the shooting with an unnamed "friend" other than

3   petitioner and that this "friend" fired the assault weapon at the residence.  Edwards alleges that

4   the shooting was in retaliation for a previous incident in which he was shot at by a resident of the

5   Feltus home.  Edwards also contends that he gave petitioner the assault weapon used after the

6   shooting at the residence.  As also noted above, however, Edwards had originally told police that

7   petitioner admitted to participating in the Feltus residence shooting and that petitioner fired an

8   assault weapon into the garage door of a house in retaliation for an incident in which the front

9   quarter panel of petitioner's car had been damaged by gun shots.  Moreover, Edwards' original

10  statement to the police was corroborated in this regard by the fact that thereafter when

11  petitioner's car was found, the front quarter panel of the car reflected bullet damage.[15]

12        At petitioner's trial additional significant and persuasive evidence was introduced

13  implicating petitioner to the Feltus residence shooting.  Police officers found an SKS assault rifle

14  and magazine loaded with 7.62 x 39 millimeter ammunition in petitioner's car.  This particular

15  magazine held 30 rounds of ammunition.  At the time of its discovery, the assault rifle had one

16  round in its chamber and 22 rounds in the magazine, eight rounds short of a fully loaded

17  magazine.  There were eight spent 7.62 x 39 shell casings found in Feltus's driveway on

18  February 25, 1997.

19        Officers also found in the trunk of petitioner's car two partially full boxes of 7.62

20  x 39 millimeter ammunition and a store receipt from Big 5 Sporting Goods dated February 19,

21  1997, for the purchase of two boxes of 7.62 x 39 millimeter ammunition.  A police criminalist

22  testified at trial that he had determined that the spent 7.62 x 39 shell casings found in Feltus's

23

24        [15]  In addition, although Edwards states that the weapons used in the Feltus residence
    shooting were removed from a car, he never states who accompanied him during the shooting or
25  whose car the weapons were retrieved from.  As discussed herein, the assault rifle used in the
    shooting was found in petitioner's car by police.  Thus, the declarations connect petitioner and his
26  car to Edwards, an admitted participant in the shooting, near the time the shooting occurred.

1  driveway had been fired from the assault rifle found in the trunk of defendant's car.  Also at

2  petitioner's trial, Leah Zamora, an employee of Big 5 Sporting Goods, identified petitioner as the

3  person who purchased two boxes of 7.62 x 39 millimeter bullets from her on February 19, 1997.

4         Regarding petitioner's newly-claimed alibi for the time of the shooting, he asserts

5  that he was at the Hampton residence on the night of February 24, 1997 from 11:00 p.m. to

6  midnight.  Petitioner and his wife declare that petitioner was on the phone with either Redmond

7  or their neighbor during this time.  They also contend that he was at his mother's house from

8  12:00 a.m. until about 12:45 a.m. on February 25, 1997, a contention that is supported by the

9  declaration of petitioner's mother.  However, the evidence introduced at his trial was that the

10  Feltus residence shooting occurred "late on February 24, 1997."  Thus, the statements by

11  petitioner, his wife, and his mother concerning the early morning hours of February 25, 1997,

12  bear little value to petitioner's alleged alibi or his actual innocence claim.[16]

13         The new evidence presented by petitioner with respect to the Feltus residence

14  shooting bears little probative value due either to the declarants' lack of credibility, potential bias

15  or the lack of clear relevance.  In assessing this new evidence in connection to the evidence

16  linking petitioner to the Feltus residence shooting, this court finds that this is not a case where in

17  considering all of the evidence, both new and old, "it is more likely than not that no reasonable

18  juror would have found him guilty beyond a reasonable doubt" had they heard the newly

19  presented evidence.  Lampert, 653 F.3d at 938.

20  /////

21

22         [16]  Petitioner's wife's declaration provides the only alibi for petitioner's whereabouts "late
on February 24, 2007," and yet in that regard she states only that she was on the phone with
23  petitioner for some of the time between 11:15 p.m. and 12:00 a.m. that evening.  Also, Redmond's
declaration was signed over fourteen years after the events  in question, calling into question its
24  reliability.  See Schlup, 513 U.S. at 332 ("The timing of the submission and the likely credibility of
the affiants bears on the probable reliability of that evidence."); see also Herrera, 506 U.S. at 423
25  (O'Connor, J., concurring) (Affidavits "produced . . . at the 11th hour with no reasonable explanation
for the nearly decade-long delay" are "suspect.").  It cannot be said under these circumstances that
26  the account of these events in Redmond's declaration is either reliable or trustworthy.

1

**CONCLUSION**

2          The evidence on which petitioner now relies does not meet the exacting standard

3   required in connection with the untimely presentation of an actual innocence claim based on

4   newly discovered evidence.  See Lee, 653 F.3d at 938.  Accordingly, this court finds that

5   petitioner is not entitled to equitable tolling of the AEDPA statute of limitations based on his

6   claim that he is actually innocent of the crimes for which he was convicted.  Because petitioner's

7   federal habeas action is time-barred, respondents' motion to dismiss should be granted.

8          Pursuant to Rule 11 of the Rules Governing Section 2254 Cases in the United

9   States District Courts, "[t]he district court must issue or a deny a certificate of appealability when

10  it enters a final order adverse to the applicant."  Rule 11, 28 U.S.C. foll. § 2254.  A certificate of

11  appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial

12  showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The court must either

13  issue a certificate of appealability indicating which issues satisfy the required showing or must

14  state the reasons why such a certificate should not issue.  Fed. R. App. P. 22(b).  Where a petition

15  is dismissed on procedural grounds, a certificate of appealability "should issue if the prisoner can

16  show:  (1) 'that jurists of reason would find it debatable whether the district court was correct in

17  its procedural ruling'; and (2) 'that jurists of reason would find it debatable whether the petition

18  states a valid claim of the denial of a constitutional right.'"  Morris v. Woodford, 229 F.3d 775,

19  780 (9th Cir. 2000) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)).

20          For the reasons set forth in these findings and recommendations, no jurist of

21  reason would find it debatable whether this action is time-barred.  Accordingly, no certificate of

22  appealability should issue.

23          IT IS HEREBY RECOMMENDED that

24          1.  Respondent's June 7, 2012 motion to dismiss (Docket No. 15) be granted;

25          2.  This action be dismissed as barred by the statute of limitations; and

26          3.  The district court decline to issue a certificate of appealability.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: February 19, 2013.

DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:13
redm0169.mtd

23